**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| RICHARD PEREZ, Individually and On Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br>     v.<br><br>APOLLO GLOBAL MANAGEMENT, INC., MARC ROWAN, and LEON BLACK,<br><br>     Defendants. | **Case No.**<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br><br>JURY TRIAL DEMANDED |

Plaintiff Richard Perez ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, among other things, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, public filings, wire and press releases published by and regarding Apollo Global Management, Inc. ("Apollo" or the "Company"), and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a class action on behalf of persons or entities who purchased or otherwise acquired publicly traded Apollo securities between May 10, 2021 and February 21, 2026, inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendant's violations of the federal securities laws under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b), 20(a), and 20A of the Exchange Act (15 U.S.C. §§ 78j(b), 78t(a), and 78t-1) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, and Section 27 of the Exchange Act (15 U.S.C. §78aa).

4.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)) as the alleged misstatements entered and the subsequent damages took place in this judicial district.

5.      In connection with the acts, conduct and other wrongs alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.      Plaintiff, as set forth in the accompanying certification, incorporated by reference herein, purchased Apollo securities during the Class Period and was economically damaged thereby.

7.      Defendant Apollo describes itself as a "high-growth, global alternative asset manager and a retirement services provider."

8.      Apollo is incorporated in Delaware and its head office is located at 9 West 57th Street, 42nd Floor, New York, NY, 10019. Apollo's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "APO."

9.      Defendant Marc Rowan ("Rowan") has served as the Company's Executive Officer ("CEO") at all relevant times.

10.     Defendant Leon Black ("Black") was a co-founder of Apollo and its former CEO and chairman before stepping down prior to the start of the Class Period. However, he remained a control person, holding 6.8% of Apollo's common stock as of July 18, 2025.[1]

---

[1] As of the date of this filing, Defendant Black remains a control person as he has not filed a Schedule 13D amendment to indicate otherwise. *See* 17 C.F.R. § 240.13d-2.

11.    Defendants Rowan and Black are collectively referred to herein as the "Individual Defendants."

12.    Apollo and the Individual Defendants are collectively referred to herein as "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

13.    This complaint relates to Jeffrey Epstein ("Epstein") and his apparent ties to Defendants. Epstein was an American financier who accrued significant wealth and became an acquaintance of wealthy and powerful figures, including Defendant Black. Epstein was also a sexual predator. He was the subject of multiple criminal prosecutions and civil lawsuits relating to his misconduct and extensive criminal activity. On July 8, 2019, prosecutors in the Southern District of New York charged Epstein with sex trafficking and conspiracy to commit sex trafficking of minors.

14.    On October 12, 2020, The New York Times published an article titled, "The Billionaire Who Stood by Jeffrey Epstein." The article detailed the relationship between Defendant Black and Epstein, including that Defendant Black had "wired Mr. Epstein at least $50 million in the years after Mr. Epstein's 2008 conviction for soliciting prostitution from a teenage girl" and that "[i]t was not clear what kind of services Mr. Epstein provided to Mr. Black[.]" The article also reported that a spokesperson for Defendant Black stated that "Mr. Epstein did not do any work for Apollo[.]"

15.    On October 20, 2020, The Wall Street Journal published an article titled, "Apollo Board Panel to Review Leon Black's Ties With Jeffrey Epstein." The article reported that a group of independent board members of Apollo would review Defendant Black's relationship with Epstein (the "Investigation"). Apollo hired Dechert LLP to conduct the Investigation.

3

16.     On October 30, 2020, Apollo held an earnings call for the fiscal quarter ended September 30, 2020. During this earnings call, Apollo's Head of Investor Relations Gary M. Stein stated, "Apollo *never did any business* with Jeffrey Epstein."

17.     During the same call, Defendant Black mirrored the sentiment, stating, "First and most important, *Apollo never did any business with Epstein*. Neither Epstein nor any company controlled by him ever invested in any funds managed by Apollo."

18.     On January 25, 2021, Apollo issued a public statement announcing the results of the Investigation (the "Dechert Report"). According to the Dechert Report, "Apollo never retained Epstein for any services and Epstein never invested in any Apollo-managed funds" and stated that the "findings of the report are consistent with statements made by Mr. Black and Apollo regarding the prior relationship."

### Materially False and Misleading Statements
### Issued During the Class Period

19.     The Class Period starts on May 10, 2021, when Apollo filed with the SEC its quarterly report on Form 10-Q for the period ended March 31, 2021 (the "1Q21 Report"). Attached to the 1Q21 Report was a certification pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendant Rowan attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

20.     The 1Q21 Report reiterated the prior statements by Defendant Black and Apollo that Epstein had never done any work for Apollo. The 1Q21 Report also incorporated by reference the Dechert Report. The 1Q21 Report stated the following:

> On January 25, 2021, the Company announced that the conflicts committee of the board of directors has completed its previously announced independent review of Mr. Black's previous professional relationship with Jeffrey Epstein and publicly released the review's findings. *The findings of the report are consistent with statements made by Mr. Black and Apollo regarding the prior relationship.*

4

21.    This statement was materially false and misleading because Epstein was heavily involved and frequently communicated with Apollo's senior leadership in the 2010s, including the Individual Defendants, concerning Apollo's business.

22.    On May 24, 2021, the New York Post published an article titled "How Jeffrey Epstein Led to Fallout at Apollo Global Management." The article reported that a source stated "Leon [Black] affirmatively recommended Epstein – it was more than a passing comment. . . . He wanted Apollo to hire him." In response, a spokesman for Defendant Black stated: "***These assertions, made by an unnamed source, are completely untrue.***" An Apollo spokesperson stated: "***Apollo never discussed or considered hiring Jeffrey Epstein.***"

23.    This statement was materially false and misleading because Epstein was heavily involved and frequently communicated with Apollo's senior leadership in the 2010s, including the Individual Defendants, concerning Apollo's business.

24.    On June 7, 2021, the Financial Post published an article titled "CPPIB Weighs Pulling Back From Apollo After Jeffrey Epstein Revelations, Source Says." The article discussed how some investors including the Pennsylvania School Employees' Retirement System, "decided to pause investments with [Apollo] and analysts openly questioned Apollo's corporate governance" due to a "tumultuous year for Apollo marked by mounting scrutiny over Black's business dealings with Epstein." The article further stated that the "Canada Pension Plan Investment Board, which manages US$500 billion, is weighing whether to keep investing with Apollo . . . . The CPPIB is disappointed with Apollo's fund performance and the firm's handling of former Chief Executive Officer Leon Black's relationship with Epstein." In response, an Apollo spokesperson stated:

***There have been no concerns expressed on these topics recently.*** We have longstanding relationships with approximately 1,700 limited partners, our fundraising activity has been strong and our corporate governance structure is industry-leading.

25. This statement was materially false and misleading because Epstein was heavily involved and frequently communicated with Apollo's senior leadership in the 2010s, including the Individual Defendants, concerning Apollo's business and numerous Apollo investors *had* expressed concerns regarding Defendants' relationship(s) with Epstein.

26. On June 30, 2021, Business Insider published an article titled "Law Firm Paul Weiss' Relationship with Apollo Has Been Lucrative. Insiders Say It's Also Sowed Tensions Within the Firm and Altered Its DNA." The article discussed Apollo's cooperation with the Dechert Investigation, with an Apollo spokesperson, Joanna Rose, stating:

> ***[W]e believe that Apollo and Leon [Black] shared the same basic interest – i.e., to cooperate fully with Dechert, share all relevant information, and help Dechert complete its review.***

27. This statement was materially false and misleading because, by incorporating the Dechert Report by reference, the Company reiterated prior statements that Apollo had never done business with Epstein. In truth, Epstein was heavily involved and frequently communicated with Apollo's senior leadership in the 2010s, including the Individual Defendants, concerning Apollo's business.

28. On July 15, 2021, Bloomberg published an article titled "Marc Rowan Plans to be the CEO Who Keeps Apollo Above the Fray." The article discussed Defendant Rowan becoming Apollo's CEO after "Leon Black was forced to step down over his long-time association with the late Jeffrey Epstein." In reference to attention that Defendant Black's relationship with Epstein received, Defendant Rowan stated:

*The noise sometimes just exceeds the reality of what's happening. . . . At the end of the day we offer our clients one product: judgment. Focus on the people. Avoid doing stupid stuff.*

29.     This statement was materially false and misleading because Epstein was heavily involved and frequently communicated with Apollo's senior leadership in the 2010s, including the Individual Defendants, concerning Apollo's business.

30.     On August 6, 2021, Apollo filed with the SEC its quarterly report on Form 10-Q for the period ended June 30, 2021 (the "2Q21 Report"). Attached to the 2Q21 Report was certification pursuant to SOX signed by Defendant Rowan attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

31.     The 2Q21 Report contained statements reiterating prior statements by Apollo and Defendant Black that the Company had no dealings with Epstein. The 2Q21 Report also incorporated the Dechert Report by reference. The 2Q21 Report stated, in relevant part:

> On January 25, 2021, the Company announced that the conflicts committee of the board of directors had completed its previously announced independent review of Mr. Black's previous relationship with Jeffrey Epstein and publicly released the review's findings. *The findings of the report are consistent with statements made by Mr. Black and Apollo regarding the prior relationship*.

32.     This statement was materially false and misleading because Epstein was heavily involved and frequently communicated with Apollo's senior leadership in the 2010s, including the Individual Defendants, concerning Apollo's business.

33.     On November 8, 2021, Apollo filed with the SEC its quarterly report on Form 10-Q for the period ended September 30, 2021 (the "3Q21 Report"). Attached to the 3Q21 Report was a certification pursuant to SOX signed by Defendant Rowan attesting to the accuracy of financial

7

reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

34.    The 3Q21 Report repeated prior statements that Apollo had no business dealings with Epstein. The 3Q21 Report also incorporated the Dechert Report by reference. The 3Q21 report stated, in pertinent part:

> On January 25, 2021, the Company announced that the conflicts committee of the board of directors had completed its previously announced independent review of Mr. Black's previous professional relationship with Jeffrey Epstein and publicly released the review's findings. ***The findings of the report are consistent with statements made by Mr. Black and Apollo regarding the prior relationship***.

35.    This statement was materially false and misleading because Epstein was heavily involved and frequently communicated with Apollo's senior leadership in the 2010s, including the Individual Defendants, concerning Apollo's business.

36.    On February 25, 2022, Apollo filed with the SEC its Annual report on Form 10-K for the year ended December 31, 2021 (the "2021 Annual Report"). Attached to the 2021 Annual Report was certification pursuant to SOX signed by Defendant Rowan attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal control over financial reporting, and the disclosure of all fraud.

37.    The 2021 Annual Report contained the following statement concerning Apollo's involvement with Epstein:

> On January 25, 2021, the Company announced that (i) the conflicts committee of the board of directors had completed its previously announced independent review of Mr. Black's previous professional relationship with Jeffrey Epstein and publicly released the review's findings.

38.    This statement was materially false and misleading because, by incorporating the Dechert Report by reference, the Company reiterated prior statements that Apollo had never done business with Epstein. In truth, Epstein was heavily involved and frequently communicated with

8

Apollo's senior leadership in the 2010s, including the Individual Defendants, concerning Apollo's business.

39.    The 2021 Annual Report also contained the following risk disclosure on employee misconduct:

> ***Misconduct by our current and former employees, directors, advisers, third party-service providers or others affiliated with us could harm us by impairing our ability to attract and retain investors and by subjecting us to significant legal liability, regulatory scrutiny and reputational harm***.
>
> ***Our reputation is critical to maintaining and developing relationships*** with the investors in our funds, potential funds investors and third parties with whom we do business, and ***there is a risk that our employees, directors, advisers, third party-service providers or others affiliated with us could engage, deliberately or recklessly, in misconduct or fraud*** that creates legal exposure for us and adversely affects our businesses. In recent years, there have been a number of highly publicized cases involving fraud, conflicts of interest or other misconduct by individuals in the financial services industry (including in the workplace via inappropriate or unlawful behavior or actions directed to other employees). . . . ***Additionally, our current and former employees, directors, consultants, sub-contractors or other affiliates and those of our funds' portfolio companies becoming subject to allegations of*** sexual harassment, racial and gender discrimination or other similar ***misconduct, could, regardless of the ultimate outcome, result in adverse publicity that could significantly harm our and such portfolio company's brand and reputation***. Similarly, allegations of misconduct could affect our reputation and ability to raise funds even if the allegations pertain to activities not related to our business and/or are proven to be unsubstantiated. ***Furthermore, our business often requires that we deal with confidential matters of great significance to us, our funds and companies in which our funds may invest, as well as trade secrets. If our employees, directors, consultants, sub-contractors or other affiliates were improperly to use or disclose confidential information, we could suffer serious harm to our reputation, financial position and current and future business relationships, as well as face potentially significant litigation or investigation***. It is not always possible to deter misconduct or fraud by employees or service providers, and the precautions we take to detect and prevent this activity may not be effective in all cases. ***Misconduct or fraud by our current and former employees, directors, advisers, third-party service providers, other affiliates or those of our funds' portfolio companies, or even unsubstantiated allegations, could result in a material adverse effect on our reputation and our businesses.***

9

40.     This disclosure was materially false and misleading because, by the time it was issued, Apollo knew or should have known, based on its possession and review of certain Individual Defendants' and other partners' email correspondence with Epstein, that the Company had business dealings with Epstein. Indeed, Individual Defendants knew that they had discussed business matters concerning Apollo with Epstein.

41.     The statements contained in ¶¶ 19-40 were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operations, and prospects, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) Defendants Rowan and Black, among other leadership figures at Apollo, frequently communicated with Epstein in the 2010s regarding Apollo's business; (2) as a result, Apollo's assertion that the Company had never done business with Epstein was untrue; (3) because of the entanglement between Apollo's leaders and Epstein, the harm to Apollo's reputation was more than a mere possibility; and (4) as a result, Defendants' statements about its business, operations, and prospects, were materially false and misleading and/or lacked a reasonable basis at all times.

## THE TRUTH BEGINS TO EMERGE

42.     On February 1, 2026, The Financial Times published an article titled, "Apollo chief Marc Rowan consulted Epstein on firm's tax affairs." The article stated that files released by the U.S. Department of Justice showed that "Epstein requested and received internal Apollo financial documents and emailed, met and called some of the firm's most senior decision makers on sensitive matters."

43.     Concerning Defendant Rowan, the article reported the following:

10

Files released last week reveal that Rowan, Black's successor, was also in contact with Epstein during the mid-2010s. Epstein pleaded guilty to soliciting prostitution from a minor in 2008.

***Rowan repeatedly correspond with Epstein***, who ingratiated himself among senior figures in finance by positioning himself as an expert on tax planning, ***over the value of Apollo's so-called "tax receivable agreement."***

The TRA was a stream of payments owed to Apollo's founders and pre-IPO shareholders, marked at hundreds of millions of dollars on the US firm's balance sheet.

***In March 2016, Rowan forwarded a detailed internal TRA calculation to Epstein***, who complained that he could not download an attached image. Rowan responded: "I am getting the calculation detail."

\*     \*     \*

***Epstein's contact with Rowan appears to have extended to various issues***. In one email he describes a meeting that appears to have been with the Apollo chief: "***Mark [sic] was here this morning; we talked Athene, Montauk, Rothschild. Planes boats etc.***"

44.     The article also detailed Epstein's involvement in Apollo's tax "inversion" deal. In connection to this, Epstein was in contact with Defendant Rowan and Sanjay Patel, another Apollo partner who "[ran] Apollo's business in Europe." The article stated:

> Epstein was also involved in discussions in 2016 about a possible tax "inversion" deal that would have involved redomiciling Apollo overseas to reduce its tax bill.
>
> ***Emails show that the disgraced financier touted the expertise of Swiss private bank Edmond de Rothschild and hosted a meeting between senior executives of the two firms at his Manhattan townhouse.***
>
> "using rothschild for the inversion allows interesting structures," Epstein wrote. Rowan quickly responded: "Agreed. Cynthia has been slow to call my partner, Gernot Lohr, back."
>
> The email appears to refer to Cynthia Tobiano, an executive at Edmond de Rothschild, while Lohr is an Apollo partner. ***Epstein forwarded Rowan's email to Ariane de Rothschild, the bank's chief executive***, who replied that she was "surprised" a call had not been made.

11

\*        \*        \*

In 2015, another Apollo partner, *Sanjay Patel, emailed Epstein. "I run Apollo's business in Europe. Marc Rowan asked me to catch up with you regarding the Rothschild conversations."* Patel and Epstein then arranged a phone call together.

That year, Epstein wrote to Ariane de Rothschild, "the apollo people are ready to start doing things together with you, sanjay patel. is their man in europe. based in london."

45.    The article provided further details on the various ways Epstein was involved in

Apollo's business. The article reported:

According to the newly released files, *Rowan and Imran Siddiqui, a former senior partner at Apollo, met with executives from Edmond de Rothschild at Epstein's Manhattan townhouse in early 2016.*

*Apollo's former chief legal officer, John Suydam, also called or met Epstein on multiple occasions, according to emails disclosed in the files.*

In 2014, Black's family officer *forwarded to Epstein an internal share offering document for Athene Holding, its life insurance affiliate*, an email shows.

*As Apollo prepared to take Athene public the following year, Epstein appeared to propose a plan that he claimed could save Apollo's co-founders up to $300mn in tax, for which he would charge a 25 per cent success fee.*

\*        \*        \*

The documents also show that *Epstein was involved in discussions at Apollo about an apparent issue with US tax forms relating to foreign partnerships,* along with Brad Karp, chair of law firm Paul Weise, which has long represented Apollo and Black personally.

In September 2016 *the head of Black's family office, Brad Wechsler, emailed Apollo's then head of tax finance, Suzanne Wong, asking for Karp and Epstein to be copied in on emails and included on "upcoming calls"*.

"For Brad its to keep him abreast of activity; for jeffrey its also get the benefit of his substantive expertise," Wechsler added. Wong replied: "Will do."

12

46.    On this news, the price of Apollo stock fell $1.35 per share to close at $133.19 on February 2, 2026. Apollo share prices continued to drop and, on February 3, 2026, Apollo share prices dropped an additional $6.34 to close at $126.85.

47.    On February 17, 2026, The Financial Times published an article titled, "SEC urged to Investigate Apollo Over Epstein Ties." The article reported that the American Federation of Teachers and the American Association of University Professors "told the SEC's enforcement director Margaret Ryan in a letter on Tuesday that they believed Apollo's communications to investors 'give an inaccurate and incomplete picture of the firm and its partners' connections to Epstein.'"

48.    On this news, Apollo share prices dropped from closing on February 17, 2026 at $125.15 to $118.34 on February 19, 2026, a drop of $6.81 over two trading days.

49.    On February 21, 2026, CNN published an article titled, "How Wall Street's Apollo got tangled up again in the Epstein files." The article repeated information previously revealed by the Financial Times articles but contained new information that reported on Apollo's response to the letter sent by the teacher's union. The article quoted Eleanor Boxham, founder and CEO of The Value Alliance Company, which advises boards and executives, who said the unions have a "strong case" for pushing for an SEC investigation, described Apollo's response as "very weak," and questioned why Defendant Rowan's meetings and correspondence with Epstein was not previously disclosed.

50.    On this news, Apollo shares dropped by $5.99, or approximately 5%, to close at $113.73 on February 23, 2026.

13

51.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common shares, Plaintiff and the other Class members have suffered significant losses and damages.

## LOSS CAUSATION

52.     As alleged herein, during the Class Period, Defendants made numerous material misstatements and omissions regarding Defendants' relationship with Epstein. Plaintiff and other members of the Class purchased or acquired Apollo securities, relying upon the integrity of the market price for Apollo securities and market information relating to Apollo, and were damaged thereby.

53.     The declines in the price(s) of Apollo securities following the disclosures alleged herein were a direct result of Defendants' fraud disclosed to investors and the market. The timing and magnitude of Apollo's securities price declines negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changes in market conditions, macroeconomic or industry factors, or other facts unrelated to Defendants' fraudulent conduct. The economic loss suffered by Plaintiff and other members of the Class was a direct result of Defendants' misrepresentations and omissions and the subsequent decline in the value of Apollo's securities when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

54.     The economic loss (*i.e.*, damages) suffered by Plaintiff and other members of the Class was a direct result of the truth about Defendants' misrepresentations and omissions being revealed to investors and the subsequent, significant decline in the value of Apollo securities was also the direct result of disclosures about Defendants' misrepresentations and omissions being revealed to the market.

## DEFENDANTS ACTED WITH SCIENTER

55.     During the Class Period, Defendants had both the motive and opportunity to

14

commit fraud. They also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time. Indeed, at all relevant times, Defendants specifically affirmed that they did no business with Epstein. Defendants referenced the findings of the Dechert Report in its 1Q21 Report stating the Dechert Report's findings were "consistent with statements made by Mr. Black and Apollo regarding the prior relationship." *See supra* ¶20. Defendant Black also stated that allegations of his and Apollo's involvement with Epstein were "untrue." *See supra* ¶22. Defendants continued to make public statements denying ties with Epstein and continued to reiterate the Dechert Report's findings in filings with the SEC. *See supra* ¶¶24, 26, 28, 31, 34, 37. Defendants then included a risk disclosure in Apollo's 2021 Annual Report regarding reputational harm that could occur from prior misconduct. *See supra* ¶39.

56.     In so doing, Defendants participated in a scheme to defraud and committed acts, practices, and participated in a course of business that operated as a fraud or deceit on purchasers of the Company's securities during the Class Period.

## PSLRA STATUTORY SAFE HARBOR DOES NOT APPLY

57.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to the scheme or any of the allegedly materially false and misleading statements pleaded herein. Many of the statements were regarding present or past events or were mixed statements of past/present and future conditions – and thus were not forward-looking. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

58.     Alternatively, to the extent that the statutory safe harbor does apply to any forward-

15

looking statements pleaded herein, the Individual Defendants are liable for those false forward-looking statements because, at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer who knew that those statements were false when made.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

59.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than defendants who acquired Apollo securities publicly traded on the NYSE during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of the Company, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors, or assigns and any entity in which Defendants have or had a controlling interest.

60.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class.

61.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

62.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

16

63.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

- whether the Exchange Act was violated by Defendants' acts as alleged herein;

- whether the statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and financial condition of the Company;

- whether Defendants' public statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

- whether Defendants caused the company to issue false and misleading filings during the Class Period;

- whether Defendants acted knowingly and recklessly in issuing false filings;

- whether the prices of the Company's securities during the Class Period were artificially inflated because of Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

64.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## COUNT I

**Violations of Section 10(b) and Rule 10b-5 Promulgated Thereunder**
**Against All Defendants**

65.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

17

66. This Count asserted against Defendants is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

67. During the Class Period, Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

68. Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they:

- employed devices, schemes and artifices to defraud;

- made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

- engaged in acts, practices and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

69. Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

70.    Individual Defendants, who are or were senior executives and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other Company's personnel to members of the investing public, including Plaintiff and the Class.

71.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

72.    Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

73.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

74.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of the Company's securities during the Class Period.

## COUNT II

### Violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(a) and (c) Against All Defendants

75.    Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

76.    This Count is asserted pursuant to Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5(a) and (c) promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5(a) and (c), on behalf of Plaintiff and the Class, against Defendants.

77.    During the Class Period, Defendants, individually and in concert, directly or indirectly, employed devices, schemes, and artifices to defraud and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Apollo securities in an effort to maintain artificially high market prices for Apollo securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5(a) and (c).

78.    Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, employed devices, schemes, and artifices to defraud and engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon Plaintiff and the Class in connection with the purchase and sale of Apollo securities; which did: (i) deceive the investing public, including Plaintiff and the Class, by denying Apollo's business with Epstein and (ii) artificially inflate and maintain the market price of Apollo securities; and (iii) cause Plaintiff and other members of the Class to purchase Apollo securities at artificially inflated prices and suffer losses when the true facts became known.

79.    As part of their scheme to defraud investors in violation of Rule 10b-5(a) and (c), Defendants engaged in the fraudulent scheme to misrepresent to investors that Apollo did not do and had never done business with Epstein, when in reality it had. This scheme was enacted to

20

support the artificially inflated prices of the Company's securities and allow Defendants Black and Rowan to sell enormous quantities of Apollo securities for profit during the Class Period.

80.    These deceptive acts were part of a course of conduct that operated as a fraud and deceit upon Plaintiff and others similarly situated in connection with their purchases of Apollo securities during the Class Period in an effort to maintain artificially high market prices for Apollo securities.

81.    As alleged herein, Defendants acted with scienter in that they participated in this scheme knowing, or with deliberate recklessness, that the public documents and statements issued or disseminated by Defendants were materially false and misleading; and knew that such statements or documents would be issued or disseminated to the investing public, in violation of the securities laws.

82.    Plaintiff and the Class have suffered damages in that, in direct reliance on the integrity of the market, they paid artificially inflated prices for Apollo securities, which artificial inflation was removed from the stock when true facts were disclosed to the investing public. Plaintiff and the Class would not have purchased Apollo securities at the prices they paid, or at all, had they been aware that the market prices for Apollo securities had been artificially inflated by Defendants' fraudulent course of conduct.

83.    As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered economic harm in an amount to be established at trial.

84.    By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5(a) and (c) promulgated thereunder and are liable to Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchase of Apollo securities during the Class Period.

## COUNT III

### Violations of Section 20(a) of the Exchange Act
### Against Defendants Black and Rowan

85.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

86.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's misstatement of revenue and profit and false financial statements.

87.     As officers of a public business, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

88.     Because of their positions of control and authority as senior executives and/or directors, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period concerning the Company's results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Company securities.

22

89.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## COUNT IV

**Violation of Section 20A of the Exchange Act**
**Against Defendants Black and Rowan**

90.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

91.     This Count is brought pursuant to Section 20A of the Exchange Act, 15 U.S.C. § 78t-1, on behalf of Plaintiff and all Class members who were damaged by Defendants Black and Rowan's insider trading during the Class Period.

92.     As alleged above, Defendants Black and Rowan each violated Section 10(b) of the Exchange Act.

93.     By virtue of their positions at Apollo and the specific facts alleged herein, Defendants Black and Rowan were in possession of material, nonpublic information at the time they sold Apollo securities during the Class Period.

94.     Defendants Black and Rowan violated Section 20A of the Exchange Act and applicable rules and regulations thereto by selling Apollo securities while in possession of material, non-public information detailed herein.

95.     Plaintiff purchased Apollo securities contemporaneously with Defendants Black and Rowan's sales, as set forth in Plaintiff's PSLRA Certification filed with the Court, which is incorporated by reference herein.

96.     Plaintiff and Class members who purchased Apollo securities contemporaneously with the sales of Defendants Black and Rowan have suffered substantial damages in that they paid artificially inflated prices for Apollo securities as a result of Defendants' violations of the Exchange

23

Act detailed herein. Moreover, Plaintiff and Class members would not have purchased Apollo securities at the prices they paid or received, or at all, if they had been aware that the market prices had been artificially inflated by Defendants' materially false and misleading statements, omissions, and scheme to defraud.

97.    This Action was filed within five years of each Class member's purchase(s) of Apollo securities contemporaneous with Defendants Black and Rowan's sales and is therefore timely.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff, on behalf of himself and the Class, prays for judgment and relief as follows:

(a)    declaring this action to be a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a class representative under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiff's counsel as Lead Counsel;

(b)    awarding damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, together with interest thereon;

(c)    awarding Plaintiff and the Class reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    awarding Plaintiff and other members of the Class such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: April 29, 2026

**KAHN SWICK & FOTI, LLC**

*/s/ Kim E. Miller*

Kim E. Miller (KM-6996)
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3732
Facsimile: (504) 455-1498
Email: kim.miller@ksfcounsel.com

*Counsel for Plaintiff Richard Perez*

25